The next case for argument is 14-1294, Purdue Pharma v. Epic Pharma. Can we have a little sidebar before you start? Please. Just because there's several issues at play and there's several different people arguing. I think I speak for the panel that there's a motion to dismiss that's out there. All of that information is confidential except perhaps for legal, certain legal arguments that might be made outside of the context of the specifics of the settlement. So parties are free to argue that, but our expectation is, given the confidentiality of the settlement agreement, certainly what we will cover today is questions regarding the underlying merits of the case. Okay? We all clear? All right. Mr. Kastibian. All right. Thank you, Your Honor, and may it please the Court. If the panel certainly has any questions about the settlement agreements, I'll do my best to answer them within those restrictions, but my plan today is to proceed on two broad sets of issues, and if I could just take a brief moment to outline where I plan to go, and you can tell me if I'm going in a different direction than you would like. First is with regard to what, in this case, are called the three low ABUC patents. The district court's own finding in this case that the 8-alpha molecule was unknown and even unexpected until the Purdue and Rhodes scientists discovered it, and then that allowed those scientists to apply a remedy that resulted in the first-ever low ABUC oxycodone API. Its patentable invention under the Supreme Court's 1923 decision in idle process, which has been recognized not only by this court's predecessors, but even as recently as by this court in Leo Pharmaceuticals. With regard to the 383 patent, which is the other set of issues in this case, that patent changed the marketplace and it saved lives by achieving a combination of properties in an opioid and opiate dosage form that no one thought could be combined. Extreme abuse-deterring hardness on the one hand, and effective controlled release of the drug on the other. The core error made by the district court with regard to the 383 patent was in trivializing the problem to be solved as meeting what, this is in the court's words, public demand for a hard tablet, which improperly read into the prior art, the inventor's solution. The solution was combining abuse-deterrence of whatever kind, and that was what there was demand for, with effective controlled release. Okay. Why don't we start with the low ABUC patent? Yes. And your reference and reliance on Oribo. Even, what difference does it make, pointing to the claims in the stack, whether you've identified 8-alpha or 8-beta, what difference does it make in terms of what you do in the end result and what the claim is really about? Well, what the claim is really about is a low ABUC oxycodone API, a safer oxycodone API, because it avoids the risk that the FDA had identified and that, in your opinion, for the panel in the Chapman versus Kastner case also identified. Now, Chapman presented a bit of a challenge for us, because on the one hand, with regard to the product claims that are at issue here, we had to claim a product which was free or substantially free, actually substantially free is probably more accurate, of 14-hydroxy. But, in your opinion for the court in Chapman, in this court's opinion in Chapman, which was unpublished, nonetheless we have to honor it, because it's part of the same patent family, it falls to the claim that was discussed in that case for not including a reference to the 8-alpha molecule. So, how do we solve the problem of claiming the reduction, which is unquestionably new and was found by the district court to be new? How do we claim that and make sure that we honor Chapman? Well, the answer is we put in this language derived from 8-alpha. So, the small remaining parts of this 14-hydroxy, at least a part of that, has to be derived from 8-alpha. My own view is that if Chapman had never occurred, we would have a new and non-obvious product if we had simply claimed low ABUC oxycodone. But, the simple fact is that the non-obviousness of that invention is demonstrated by the discovery of the 8-alpha molecule and the ability to deal with it in a way that no one had ever figured out how to deal with it before. Why does the origin of the 14-hydroxy matter? Well, the origin of 14-hydroxy matters because of the way that oxycodone was made before the 8-alpha molecule was discovered. In all the ways that oxycodone was made, the ABUC impurity remained in the final product at very high levels, certainly relative to the 25, 15, and 10 parts per million levels that are claimed in these inventions. But, if the purpose of the drug is to have a safe administration and to remove, or the purpose of the pen is to remove all of the 14-hydroxy, and that means it's achieved, why does it matter where the 14-hydroxy comes from? Well, it mattered very much because it tells you, so maybe I should back up here, Judge Rainier, in so many of the Supreme Court's obviousness cases, what we're looking for is the presence of invention. Is there something that just an ordinary artisan couldn't have done before? And that's Eibel. Eibel says that the discovery of a problem that people didn't know about before in the past, and the remedy to that problem, represents patentable invention. Eibel used gravity. It was an observable machine, and he used gravity to elevate the wet paper stock that was going into the machine by some six inches or so, to increase the pitch so that gravity would cause the stock to travel at the same rate as the wire that was pulling the stock into the machine for pressing and drying. But that was directly related to discovering the reason for doing it, and I guess I have the same question as Judge Rainier did. What does it matter whether it's 8-alpha or 8-beta when the invention is directed toward getting rid of 14-hydroxy? At the end of the day, you want to get rid of the 14-hydroxy. That's right. How does whether it's 8-alpha or 8-beta, and again, I'm just repeating what Judge Rainier was asking about, how does whether it's 8-alpha or 8-beta have anything to do with that? I thought I was heading toward an answer with him. Let me try it this way. In addition to what I said in response with regard to looking for the non-obvious invention, 8-alpha and 8-beta are different molecules. They have fundamentally different properties. 8-alpha, once it was discovered, was also discovered to be about 400 times more sensitive to acid. Now, that's what's happening in the hydrogenation step that was being used to create oxycodone in the prior art. What had to happen, once you know that it's 8-alpha, and you can see this in the patent, A462, column 8, lines 28 to 30. A471, column 26, lines 13 to 18. You have to make the hydrogenation reaction a more basic one. You have to add more alkaline elements to it. You have to increase the pH. That's another way of putting it. In addition, you have to use a different catalyst in the reaction. If you don't know that, then all you're going to do is repeat what the Purdue and Rhodes scientists... If this isn't as important as you're arguing today, why didn't you tailor your claims to the discovery of the 8-alpha? Oh, we absolutely did. Well, I don't know. I mean, it seems to me that what you did is that you discovered, or rather claiming, hydrogenation at the final stage. Well, actually... So all you did is hydrogenate it again. Hydrogenation is not claimed in the claims. Hydrogenation is part of the story. It's part of the invention story. What we claim is a product. And the way that we very carefully... What you say in the claims, derived from 8-alpha. That is telling the world, and we told the world in our specification, and we told the world in our claims, that what we are doing is we are eliminating this down to a vanishing point. And the only way you can tell is that part of what's left over is derived from 8-alpha. And that was part of the infringement analysis also done by the district court, which found infringement. Okay. Going back to the point you were making about somehow you're going to perform a different process and perform it in a different way if you know 8-alpha in play. You kind of made that argument on page 38 of your blueprint. But I couldn't find anything in the record where you talk about the 8-A, you know the specific conditions about time and acid amount, et cetera, to run hydrogenation. You cite some pages there, but the pages you cite only talk about differences between 8-alpha and 8-theta, not the differences between the hydrogenization. Hydrogenation, I think. Process for removing 14-hydroxide. So I hope, Your Honor, that we've been complete with regard to this issue. I think if you look at pages 18, 19, 20 in particular of our brief, which is in the statement of the case, under the heading Designing a Novel Solution, what you see there in particular with reference to the chart that we provided for the court at the top, page 19, which you can compare to the earlier charts, which show the way that oxycodone was made before the case, is that you are now doing a different, and this is the way Purdue did it, this is not what the claims say, but this is one of the things that you have to take into account. You do a second hydrogenation step of the free base, and you do it under different conditions and with a different catalyst. And you'll see that that's at the top of page 12. I'm looking at the chart of 19. On page 19, is that what you're saying? That doesn't differentiate between 8-alpha and 8-beta, right? Well, if taken along with the text that precedes it, it absolutely does. Because if you compare, for example, what was thought to be the case beforehand in the charts that precede it. Wait, you're saying the text that precedes it? What are you talking about, the text in the brief? Yes, the text in the brief. What we're trying to do in this section of the brief, Your Honor, is to explain to you why 8-alpha matters. And 8-alpha matters for all the reasons that actually follow this chart. And you will see that applying the prior art hydrogenation. Where are you referring? I'm at page 19. Okay. Okay. So we start there, and I'm cognizant that I need to address the 383 patent with my time ticking down. But with regard to this drawing, we're now showing that the second hydrogenation was run longer than usual, for example. This is a new hydrogenation step, if you compare it by the way to the earlier way. Yes, step three. Before it was just salting. Now it's salting the hydrogenation. Before you didn't have a second hydrogenation. Exactly. Exactly. And if you don't know that there's 8-alpha in there, all you're going to do is run the same hydrogenation under the same conditions over and over again. This hydrogenation, as those portions of the patent that I pointed out to you earlier, are done under different conditions, less acidic, more basic, as well as with a different catalyst. And what we're saying here at the bottom of 19 over to 20, the ordinary artisan would not have applied hydrogenation or any other technique to the oxycodone salt, as opposed to the oxycodone free base, or under conditions that would stop the continuing conversion of 8-alpha to 14-hydroxy. The next sentence says specific acid amounts and specific timing of the removal of the catalyst had to be adjusted with regard to the particular properties of 8-alpha. Is any of that in the claim? The derived from 8-alpha is the way that it goes in the claims. And ultimately, the low parts per million of the 8-buck impurity is what distinguishes these claims from what came before, both for novelty purposes and for non-obviousness purposes. I don't understand your answer to that. So the answer is yes. Derived from 8-alpha is in the claims to make very clear that we are getting rid of virtually all of the 8-alpha. If that derived from 8-alpha was not in the claims, then you could, I suppose, make the argument that, well, as long as you get rid of it from wherever, it doesn't matter. But as a matter of scientific fact, you have to know 8-alpha. But you also added the second step of hydrogenation. And that's what's new in the patent. Well, again... Because it's well known in the art. Just to bring it up... The more you watch it, I guess, the more times you go through this step, you end up with the last 14-hydroxy. Well, that's not exactly true, because that's exactly what the prior art tried and failed to do. Because 8-beta, which was hydrogenated under very different circumstances, in much more acidic conditions and without the specific removal of the catalyst that I've tried to explain in my colloquy with Chief Judge Prost, that was tried. You extend the hydrogenation longer and longer. The definition of insanity, I believe, is trying the same thing over and over and expecting to get different results. More hydrogenation didn't get rid of the 14-hydroxy. And it never happened. Isn't it obvious that at some point, someone was going to try it at the later stage, at the salting stage? I don't know if your question is about whether it was going to inevitably be discovered. And I'm not sure that that's ever been a case that's been made. Is there anything clearly erroneous in the district court's finding that everybody in And the longer you did it, you would expect to see less of it. Well, if that's the finding effect of the district court, then absolutely that's clearly erroneous. Because hydrogenation of doing it over and over reduced it temporarily, but then it came back in the salting step. Well, maybe doing it over and over at the same stage would be insane. But trying it at the salting stage or after the salting stage... But a skilled artisan would know. No. No. A skilled artisan didn't know because the skilled artisans were trying and failing. With respect, Your Honor, that would be classic hindsight. What is clearly erroneous about a finding that one of ordinary skill in the art would, in the ordinary use of common sense, eventually have tried it at step three? Well, the question is, what is it? Hydrogenation. Well, hydrogenation in and of itself doesn't solve the problem. That is part of the point of why it's essential to know that 8-alpha is there. Or do you say it's essential at what stage you do the hydrogenation? Well, you have to hydrogenate it when it's present so that you are getting rid of it. So if it's going to reappear after salting, then yes, you have to hydrogenate after salting. And I haven't even touched the 3-H pre-patch. I'm going to give you two minutes more to discuss that, and then we'll restore two minutes of rebuttal at the end. Thank you. Thank you very much, Your Honor. Move on to 3-H pre. With regard to 3-H pre, the holding against us was both on anticipation grounds and obviousness grounds. On anticipation, we've made our points in our brief. The disclosure of or the description of analgesics such as 2-N-sase and acetaminophen. The main argument here is that McGinty didn't deal with an opiate? McGinty didn't deal with an opiate, and it didn't deal at all with crushing strings or making something hard. It was strictly about control and release. Okay. And the district court found that every analgesic on the market in a sustained release form at the time of McGinty application was an opiate? The district court did find that, and that is clearly erroneous with regard to the record because there were, in fact, a broader set of analgesics which were not opioids that were on the market at the time, and we've cited that in our brief. With regard to obviousness. So it's not every, but it's most, many? Some. Some. I believe that there were two or three, and I believe one of them was an opioid. But, of course, the point of McGinty was to bring control and release to a wide variety of 19 different categories of kinds of drugs. But with analgesics, the only things that were disclosed as and the like were three things that are nowhere near opioids. If I told you to go get me an aspirin or a Tylenol or something like that and I came back with oxycodone, no one would say, oh, yeah, you got me what I wanted. And that's our point with regard to anticipation. With regard to obviousness, our point is basically this. If we thought McGinty, the McGinty reference, was going to solve the twin problems of abuse deterrence through a hard tablet as well as effective controlled release, we'd still be sitting here waiting. There's nothing in there that would cause an ordinary artisan to even look at McGinty to find a solution for hardness. And with that and with the observation that the tests which are argued against us by Dr. Muzio were done on a non-opioid, and they were done not in complete agreement with example three of the McGinty reference, because there was no evaluation of shear rate and there was also- The court found that hardness or breakage strength was inherent in the reference, the McGinty reference. What's your response to that? Well, our response to that is that that has to be clear error because inherency is a very strict test. And the first thing is that Dr. Muzio didn't even test an opioid. He tested an antihistamine. So I don't know how we can know that McGinty not only describes opioids, but also inherently describes the formulation with an opioid in it that is always going to be hard. Did you present a contrary analysis for your expert? We did not. We did not present contrary testing. We presented contrary testimony with regard to his testing because, quite frankly, we didn't even know what we would be able to test given the lack of any disclosures or descriptions in McGinty with regard to either hardness or opioids. Unless the court has further questions at this point, I'll return on rebuttal. Thank you. We'll restore two minutes. And to try to keep it even, Mr. Schuman, why don't we add two minutes to your time, which will give you a total of 11, and Ms. Mullen will add two minutes to give you 13 minutes to try to even it out. I appreciate that, Your Honors. Good morning. My name is Mark Schuman. I'm a police of court. I'm representing the epilete Teva Pharmaceuticals today. We've split the arguments up based upon the interests of our parties. I'm going to take the 383 patent today, and I can also address issues with regard to the settlement, the mootness issue, the motion to dismiss that Teva has filed as well, if you want to talk about that. Tell us about the 383 and the two points your friend made about the deficiencies. Let's start with the anticipation argument. So there is an allegation on appeal that there is a reference, a superior reference in the Site Table 56.5 that allegedly contains another sustained release analgesic. And they claim for the first time on appeal that there is a third analgesic that has sustained release. And so the district court's finding that there were two sustained release products on the market that were analgesics and both of those were opioids is in error. So that's the setup for this argument. The response is as follows. Dr. Block, the expert for Teva, who the district court relied on, specifically in his testimony looked at this table in DePuro 56.5 in starting his testimony. And I'll direct the court's attention to A3372. And he specifically starts by looking at the DePuro handbook, and he references both tables 56.5 and 56.7. Those are tables dealing with both opioids. What volume is this? That's a good question, Your Honor. At the top of each volume are the page numbers. I can read it for you if you want. I know that the court's loathe to do that, but let me just start with the question. The question on page A3372. And they list two tables, 56-5 and 56-7, non-oipic opioids and, moving to the next page, opioid analgesics. The answer is yes. All right. Now I notice also that you have oxycodone highlighted on the slide. Why is that? Oxycodone is one of the most widely used opioid analgesics. Why is that important? And then he goes on to talk about this book and the tables. And Dr. Block concludes a few pages later, and I won't go through all of that because of our time concerns, but this is the testimony the district court relies on. Dr. Block concludes, after looking at these tables, both of them, that one skilled in the art would conclude that there were two analgesics that were available in sustained release form. One of them is morphine and one of them is oxycodone. And then he goes on to further conclude that of those two, oxycodone was essentially the elephant in the room. It was the biggest product. It was the one that would come immediately to mind to one skilled in the art because it was the most prescribed drug in that class. It was the one that was being abused. It was the most prominent drug. And so these are the findings the district court made. Now, I want to add, there was no cross-examination of Dr. Block on this. No one came up and said, now, Dr. Block, you see that you talked about table 56.5, and there seems to be some sustained release naproxen product there. Why didn't you count that? Your argument is that a skilled artisan, it's not a major leap to go from an analgesic to oxycodone. He wouldn't have considered it. A skilled artisan would consider that there are two, morphine and oxycodone, for some reason, and we don't know why because there was no cross-examination. This table 56.5, it does not fall within the purview of what one skilled in the art would consider. I further add that they didn't put their own expert on to testify about this table. The first time we hear about this table is on appeal. In an appellate argument, they want judges and lawyers to interpret this table, and one skilled in the art has already done so at the district court level. Furthermore, let's assume they're right. Let's assume there are three and not two. Is that reversible error? They have to not only show factual error, but they need to show reversible error. Now, I'm not conceding that it's factual error because it's not. The only uncontroverted evidence in the record comes from Dr. Block that there were two, and he took into account this table. But let's assume that's wrong, and there were three. The testimony still is that oxycodone was the elephant in the room, and one skilled in the art would have been drawn to that product. And so under the Enright-Petering case, there still would have been inherent participation. There was no reversible error on this point. Was McGinty in front of the PTO during prostitution of 383? It was, but in a very limited sense. Obviously, McGinty was there for what it taught, but not for what was inherent in it. And most of the trial that we had was about what was inherent in McGinty. A lot of the testing that Dr. Muzio did about the hardness, a lot of the inherency testimony from those skilled in the art, both for and against on both sides, those things were not in front of the Patent Office. And so the presumptions that attach to the teachings of McGinty with regard to the patentability of the 383 patent really don't apply, I think, very strongly because the evidence simply was not there in front of the Patent Office. Now, let me turn to the other error, and that is the error with regard to the obviousness case. Wait, you're not conceding there was error? The error that was alleged with regard to obviousness, and that is the fact that McGinty somehow does not lead to obviousness. And it's interesting to note, you heard my opponent say that if we were going to wait for McGinty, we would never have an abuse deterrent property. The McGinty application, the U.S. version of it, turned into a patent called the 963 patent, which is Orange Book listed for the Purdue product today. It was in a lawsuit. It was settled in the settlement documents that you have in front of you. It is a viable product. It is a viable product for oxycodone. That's the simple answer to this. McGinty solved the problem. It solved it before Grunenthal did. It was anticipating, and it also rendered the patent obvious, by the way, as well. The district court did not err in those regards. What's your understanding of what the district court found in the Concerta tablet that might arguably not be present in McGinty? I was unclear what the obviousness combination is or what role Concerta was playing.  Concerta is more or less, Your Honor, a straw man that's been constructed here on appeal. Concerta is real-world confirmation of what the district court found. Let me back up a minute. The district court found that the prior art relating to polyethylene oxide would solve the problem that was identified. The problem here was that oxycodone was being abused by crushing. People would crush it, and they would chew it, swallow it. They would crush it and inject it. They would crush it and snort it. Whatever they did to abuse it, they started by crushing it. The judge found that was the obvious problem. The solution, obviously, and was supported by evidence, was to make it harder. The known problem based on excipients that were used by those skilled in the art was to look for a hard excipient. One of those was polyethylene oxide. Even the testimony of plaintiffs' own witnesses, fact witnesses, their head of therapeutics, Dr. Mannion, for instance, testified that as early as the 60s, it was known that polyethylene oxide was hard. There was much evidence, we said in our brief, I won't take the time, that everyone knew polyethylene was hard, and they knew that it would make a tablet that had controlled release properties. On top of that, other people began using it by hot melt extruding it. They began putting it through these extruders to put heat and pressure on it, and the tablet got hard. They still got release properties that were controlled release. One skilled in the art, according to district court, would follow this path and find a hard tablet that was sustained release, and you end up ultimately with McGinnity, which was the end of the trail of all this prior art. This is the analysis the district court went through. Concerta gets inserted in this analysis as real-world evidence of this. What happened was there happened to be a drug, Concerta, which is methylphenidate, it's an ADHD drug, and this was abused by people. They would crush it up and snort it or swallow it, but it turned out when they put it in a longer-acting product, this Oros type of product, there was less abuse, and it was known through a number of the testimony. One of the gentlemen was Gupta that we cited in our brief. It was known that it had two properties that thwarted abuse. One was that it was hard, and the other is if you added water to it, it gelled. Now, why do I mention that? Because the brief makes a mention that it wasn't hard, it gelled. Well, it did both. We had two patents down below, two patents. The 314 patent, which you're not seeing on appeal, was a gelling patent. It was a PEO patent that said when you added water, it gelled and thwarted abuse, and the other one said PEO makes it hard. So we put in evidence of both, and the concerta says both. It makes it hard, and it also gels. And they say that the district court erred because concerta wasn't hard. It gelled. Well, actually, it's both. And you'll look at the record, and you'll see evidence of both. I hope that answers your question, Your Honor. Settlement agreement. I would suggest if you're going to look at the settlement agreement, you look at it as a simple settlement agreement with a license as the first pass, and then start looking at the embellishments, the consent decrees, and all the other documents. Think about that. In a settlement agreement with a license. You're arguing a settlement agreement. I'm not sure that we can say anything. I mean, it's confidential, isn't it? I think that in general terms, I don't know. So how can I ask you a question or respond to what you're saying? That's fine. I'm perfectly happy to leave it at that. Thank you. Thank you, Your Honor. I appreciate it. Because your time has expired. Yes. May it please the Court. Barbara Mullen on behalf of AMNIL. AMNIL is actually here on appeal of a judgment based on collateral estoppel, and that applied to the invalidity judgment from the Tev trial. And since the Court seems to be interested in that obvious determination, I'll address that first. I think the first problem with Perdue's argument is that we have a fundamental disconnect between what is claimed and what they claim to be their invention. They have said repeatedly today and in their briefs that their invention is using a second hydrogenation step on the oxycodone salt. That is not what is claimed. In fact, in argument today, it was pointed out that the claim is actually to a low ABUX oxycodone API. It's not a process claim. You can search in vain in these patents, in the asserted claims, for any reference to a second hydrogenation step that's performed on the oxycodone salt. And that's really what distinguishes this case from EIBL processing. In the EIBL processing case, the inventor invented a machine, a machine that was the remedy to the problem, and he claimed that machine. He didn't claim the paper that was made as a result of the machine. He claimed the machine that solved the problem. Perdue has not claimed the remedy or what it claims now or says now that actually solves the problem of a high-level 14-hydroxy. Well, their argument is, and maybe you can address this, your friend on the other side referred repeatedly to Chapman, is that Chapman set up a roadmap for us that if you include, if you specifically call A-alpha, you're there, and that's what's missing. What is your view of that? Well, Chapman was method-claimed. And again, that goes back to what they're saying here. They have invented a new method of reducing 14-hydroxy levels, which involves hydrogenating an oxycodone salt. But the claims here are not method claims. They're product claims or product-by-process claims. And so when you have a product claim, what you're looking at is, for example, does the 8-alpha make a difference? And it doesn't. It doesn't matter whether in the end product, the low level of 14-hydroxy, whether that 14-hydroxy came from 8-alpha, 8-beta. Well, your friend says that there are different properties to the 8-alpha, so that timing and amounts of acid and other things would be different once you recognize that you've got 8-alpha as opposed to 8-beta. Isn't that correct? I didn't mean to interrupt. You can search in vain in the patents for any of those specific catalysts or reaction properties. If you look actually at the 799 patent to which he was referring and if you look at page in the appendix, if you look at page A461, you'll see that the patent does not distinguish in the description between 8-alpha and 8-beta. If you look at about line 54, column 5, pardon me, the term 8-14-dihydroxy-7-8-dihydrocodienone includes either 8-alpha, 8-beta, or a mixture of both. So when the description goes on, it's talking generically about alpha, 8-alpha, 8-beta, or both. The only place in the patent where 8-alpha is called out specifically is in the figures. If you look at figure 2, which is at page A455, it shows the way you dehydrate 8-alpha is by H+, acid. There's nothing there about time, about catalysts, about reaction conditions. There's just nothing there, and that's the only place in these patents where they distinguish between what you do for 8-alpha and what you do for 8-beta or a mixture of both. And in fact, the conditions that will dehydrate 8-alpha will also, as the district court found, dehydrate 8-beta. So it's the same conditions that you're going to use for the reaction. What does the district court say about EIBL process? I don't think EIBL process was specifically addressed in the district court opinion. It was raised very briefly in, I think, their reply brief after trial, if I recall correctly. So what should we do? I think you're right that probably it didn't address, or at least I haven't found it. Where does that leave this court? What should we do about that? Well, I think it's a case. I think you can consider the tenets of it, but I think they don't apply here for the reasons that I've discussed. EIBL was really talking about, and there are other cases that talk about the idea that if you identify a problem that was unknown and you remedy that problem and you patent the remedy, then it may be an inventive act. But in all those cases, they actually look at what is claimed to determine whether or not it's obvious. And what is actually claimed here is not the supposed remedy, which is a second hydrogenation step at the salt level. What's claimed here is a product having a low level of 14-hydroxy. So we can do a de novo analysis and apply EIBL's process to the extent it is even applicable here. I believe that's the case, Your Honor. Obviousness can be reduced to novo, though. And getting back again, it's the same. My colleague was referencing page 19 in Purdue's opening brief, and again talking about this is the process that they allegedly invented, but they haven't claimed this process. There is no claim that's directed to having a salting plus hydrogenation two. And as the district court found, the prior art taught that 14-hydroxy, in its base or salt form, could be converted to oxycodone through hydrogenation and that you could continue that hydrogenation until the 14-hydroxy essentially disappears. And Hsu in particular discusses this, especially if you refer to example 6, where he taught using hydrogenation as a purification step. And he said, take the 14-hydroxy, hydrogenate, check to see if the 14-hydroxy has disappeared, and if it hasn't, hydrogenate some more. The other thing that's pertinent here is that although the Purdue inventors have characterized this reappearance of 14-hydroxy as a result of 8-alpha could be a problem, requiring the second hydrogenation step, it's not the process that's used to make the API that's used by Teza and Amil. That is actually made without the second hydrogenation step at the salt level. There is no hydrogenation of the salt. And where did that leave us? Because this isn't an infringement question. This is all here on validity. That's exactly right. So it leaves us at the point where they're now trying to argue a theory of validity that would have eliminated their infringement position. They prevailed on the infringement at trial, and now they're changing their tack, and they're saying, suddenly, our invention, although they did some of this at trial as well, our invention is actually in the second hydrogenation step, which is something they did not have to prove as an element of infringement. And now they're arguing that that is a patentable distinction over the prior art. Two discussed hydrogenating oxycodone base. Ramanathan talked about converting 14-hydroxy into its hydrochloride salt and then hydrogenating the hydrochloride salt. So as the district court found, in a very thorough opinion, applying all the grant factors, the claims to a product having a low level of 14-hydroxy were obvious, particularly when people in the industry were motivated by the FDA saying, get your 14-hydroxy levels down. They were motivated to do it. If I can touch just briefly on the collateral estoppel issue, what that means is that, obviously, if the merits of the decision is affirmed below, there should be no dispute that collateral estoppel is properly applied. Purdue admitted that all elements of collateral estoppel were satisfied when the district court ordered Purdue to show cause as to why collateral estoppel should not be applied and admitted that it should. So the result that flows from that is that if either the appeal of the decision on the merits has been mooted by the settlement agreement, or if the decision is affirmed on the merits, then there should be no dispute that collateral estoppel applies. Can I just, for clarification, and I know we don't want to get into some, this is a separate question. If the appeal is mooted by the settlement agreement, what we have before us that's left are the J-Mall estoppel questions, right, on the estoppel. And it's my understanding that the narrow area of our review wouldn't be to review the merits of those determinations, but simply to review whether or not estoppel was correctly applied. Is that your position? That's correct. So that we would not be able to reach the merits under those circumstances. That's correct. The analysis would be whether or not collateral estoppel was properly applied, but when you're undertaking that determination, you do not look at whether the underlying decision was correct. If it's a final and binding judgment, and all the elements of collateral estoppel were satisfied, for example, if it was a full and fair opportunity to litigate, which is usually the big one, then collateral estoppel should be affirmed without looking at the merits. That's correct. Could you just address commercial success for a moment? The district court seemed to put a great weight on the lack of evidence that the low level of 14-hydroxy was ever marketed as a basis to purchase the product. Isn't that too narrow a view of commercial success and what might support it? I think it was only one element of what the court considered in the context of commercial success. I think it also considered that there were other factors that actually drove sales both up and down of oxycodone, and also looked at the commercial success that Purdue alleges is that of its supplier, because it's the supplier that makes the API having a low A-buck, and when they tried to sell that to somebody other than their corporate affiliate, they were not able to sell it. So I think the district court looked at more than just that it wasn't advertised as being a low A-buck oxycodone. It looked also at the fact that there were actually other factors that drove sales up and down. Why should the supplier's success not factor into a commercial success analysis? It may be that there are circumstances where it would, except that here there wasn't commercial success of the supplier. The success of the supplier was due to the fact that Purdue invested a boatload of money into setting them up as Purdue's supplier because they thought that it would give them a cheaper and more dependable source of their API, as opposed to, and in fact they made that investment before Rhodes actually geared up and started making the low A-buck API. So the only person that Rhodes has ever really sold to is its corporate affiliate, and when it tried to sell to anybody else, it didn't have success in doing so. So I have just a few seconds remaining. So again, really, Amil is here because of the collateral estoppel issue. For good reason, the obvious misdetermination should be affirmed on the merits if it has not been mooted by whatever is in the settlement agreement. The district court gave a very thorough opinion to the applied grant, looked at the scope and content of the prior art, that everything that he was supposed to do, he clearly had, Judge Stein clearly had, a great grasp of the technical nature of this case. There have been no claims by Purdue, either at the district court level or here, that it did not have a full and fair opportunity to litigate this case. In fact, it had two trials to do so. So the collateral estoppel judgment should be affirmed. Thank you. Thank you, Amil. I'll take the issues on rebuttal in the order that my friends addressed them. Start with 383. With regard to anticipation, my friend, Mr. Schuman, refers to extrinsic evidence outside the four corners of the patent. That doesn't tell us what the words such as these three drugs and the like means. This court's Finisar decision says ordinary rules of grammar apply with regard to anticipating references. Ordinary rules of grammar, of which a justum generis is a classic one, tell us that aspirin, Tylenol, and another NSAID are not and the like of oxycodone, opioids, or opiates. And I'd also point out that claim eight is specific to oxycodone. With regard to obviousness, the fact that McGinnity was the part of a lawsuit, another lawsuit, is really just a misleading fact here because what a patent claims versus what it describes and discloses are two entirely different questions. It may very well infringe, but it may not describe. And that's what we have here is a patent that doesn't describe. Concerted, it was said to be a straw man. Well, it was a straw man that our friends on the other side opened up at trial. Concerted, by the way, was said by Judge Stein to have a PEO outer shell. That is absolutely, clearly, and demonstrably erroneous. The outer shell was made of cellulose acetate, A87095, also A2470-75, and Grudenfeld's reply brief at page 23 support that. And with regard to the 383 patent, secondary considerations, Judge Stark, you mentioned that with regard to Loewe, but with regard to 383, they're really powerful when you take this outside of the anticipation context where it doesn't belong and into the obviousness context. This changed the entire marketplace. This changed FDA. It changed the FDA's calculus of safety, and it saved lives. It made oxycodone safer. Abuse, as the amethyst brief on abuse has pointed out, has dropped significantly since the introduction of this into the marketplace, and if that regulatory success combined with the later success in the marketplace isn't an appropriate secondary consideration, I'm not sure what is or should be. With regard to Loewe, my friend on the other side said that it was raised very briefly. Well, that's also just not true. We raised it repeatedly, and we put that in our brief. That's in our opening argument, A39-3440, A49-14.16 in our pre-trial memo, A53-59 in our proposed findings before trial, A73-15 proposed findings and conclusions after trial. It was all over the place. The judge didn't deal with it, and our opponents, by the way, never deal with the court's more recent decision in Leo Pharmaceuticals. With regard to the substance of the EIBO rule, my friend says that it's required to say that you have to patent the remedy. You can search all the EIBO process cases that we've cited to you, and you will search in vain for that rule. The rule out of EIBO is the discovery of a non-obvious problem and the application of a solution to it is patentable invention. EIBO didn't say gravity in its claims, but that was what the solution was to his claims. Judge Stark, you're absolutely right with regard to the district court's too narrow focus on commercial success. Rhodes' commercial success was the difference between night and day, between viability and non-viability. Finally, although I again have to be careful, both of my friends have brought up the questions of mootness, and let me just respond to that by saying the following. In the documents, which you've been urged to read and which I'm sure the court will, you will see numerous references to this case, the Loewe Buck dispute, and in anticipation that this dispute will continue. In fact, there is a remand appeal result that is specifically anticipated in Section 4D. I think I can say that much in open court. Section 4D of the settlement agreement talks about the consequences of a remand appeal result. Releases were granted on other patents, but not these. There was no consent judgment with regard to the Loewe Buck appeal. And ultimately, aside from all of the textual indicators that that's what the parties intended, as we've said in our papers, there is still a real live dispute. The dispute has obviously been joined here, so this is not abstract. It's not a side bet. And what are the consequences of a decision? I realize we're in an Article III court with limited power, but what are the consequences of a decision on the Loewe Buck patent? The consequences are at least two. One of which is it will prevent our friends from accelerating what is called the terminal date, and I think I can say that without going into detail about what it means. Okay, well, I think we really did raise the settlement before, and we obviously already have read it. The last point on that is that under all of the circumstances, particularly all the clear indicators of intent, if the court were to, despite those findings, dispute Loewe, it should nonetheless order a vacature of the judgment in favor of TEDA so that this case can be litigated by the other parties. Thank you. Thank you. I thank all parties and the cases that submitted. Thank you.